## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GN NETCOM, INC.,              )
                             )
           Plaintiff,      )
                             )   C.A. No.
vs.                          )
                             )
PLANTRONICS, INC.,       )   JURY TRIAL DEMANDED
                             )
           Defendant.     )
                             )

## COMPLAINT

This is an action to restrain anticompetitive conduct by Plantronics, Inc. ("Defendant") and to remedy the effect of its unlawful conduct. Plaintiff GN Netcom, Inc. ("GN"), by its attorneys, brings this action for relief against Defendant's continued and ongoing violations of the Sherman Act, the Clayton Act, and Delaware common law.

## PARTIES

1.    Plaintiff GN Netcom, Inc. is a Delaware corporation having its principal place of business in Nashua, New Hampshire. GN is a Headset manufacturer and its Headsets are marketed and sold in the United States of America under the Jabra and GN Netcom brands. GN is a subsidiary of GN Netcom A/S, which is a subsidiary of GN Store Nord A/S, both Danish corporations.

2.    Defendant Plantronics, Inc. is a Delaware corporation having its principal place of business in Santa Cruz, California. Defendant is a Headset manufacturer and its Headsets are marketed and sold in the United States of America under the Plantronics brand.

## JURISDICTION AND VENUE

3.    This action is brought under Sections 1 and 2 of the Sherman Act; 15 U.S.C. §§ 1 and 2; Sections 3, 4 and 16 of the Clayton Act; and 15 U.S.C. §§ 14, 15 and 26. This Court has

jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. §§ 15 and 26.

4.     Defendant is subject to personal jurisdiction in the State of Delaware for numerous reasons, including, but not limited to the following: Defendant is a citizen of Delaware; Defendant has caused injury to GN within Delaware; Defendant practices the unlawful conduct complained of herein, in part, within Delaware; the unlawful conduct complained of herein causes tortious injury, in part, within Delaware; Defendant regularly does or solicits and conducts business within Delaware; Defendant regularly and systematically directs electronic activity into Delaware with the manifest intent of engaging in business within Delaware, including the sale and/or offer for sale of products to Internet users within Delaware through the plantronics.com domain name.

5.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c), Defendant being found in and transacting business in this District.

## THE MARKET FOR HEADSETS

6.     The relevant market for this action is the sale of corded and wireless headsets ("Headsets") to Enterprise Contact Centers ("Contact Centers")[1] in the United States of America.

7.     Headsets connect to the end-user's telephone and allow them to speak on and listen to a phone conversation without picking up or holding a stationary phone receiver.

8.     Headsets are a hands-free solution for office workers who are engaged in phone calls for a majority of their work day.

9.     Both parties produce a range of Headsets which are comparable in quality and value.

---

[1] Contact Centers can be referred to as Call Centers; the terms are interchangeable.

10.     Both parties recognize Contact Centers as a market for the sale of Headsets.

11.     Contact Centers are large centralized offices used for the purpose of receiving and transmitting a large volume of requests by telephone.

12.     Contact Centers are often operated through an extensive open work space, with work stations that include a computer, a telephone, and a Headset for each employee.

13.     The use of Headsets by Contact Center employees is necessary because of the need to be able to work on a computer or engage in other activity with their hands in order to support the phone conversation.

14.     The use of Headsets by Contact Center employees in the United States is high, with over 99% penetration in this market.

15.     The parties have specialized sales and marketing strategies for purchases by Contact Centers.

16.     The United States of America is the relevant geographic market for the sales of Headsets.

17.     There are numerous differences, including, but not limited to Headset warranty, voltage, and shipping costs, which make it impracticable for Contact Centers to purchase Headsets from suppliers outside the United States of America.

18.     There are worldwide warranty differences which make it impracticable for Contact Centers to purchase Headsets from suppliers outside the United States of America.

19.     There are worldwide voltage differences which make it impracticable for Contact Centers to purchase Headsets from suppliers outside the United States of America.

20.     There are shipping costs, which make it impracticable for Contact Centers to purchase Headsets from suppliers outside the United States of America.

## INTERCHANGEABILITY AND CROSS-ELASTICITY OF DEMAND ARE ABSENT

21.     Headsets grant their users freedom to use their hands for other tasks while maintaining privacy and call clarity in an environment hostile to these goals.

22.     Headsets are a unique product without a functional equivalent or interchangeable substitute.

## THE ROLE OF SPECIALIZED HEADSET DEALERS TO CONTACT CENTERS

23.     A critical channel for sales of Headsets to Contact Centers is through a limited network of approximately 20 specialized independent distributors ("SIDs").

24.     SIDs have been, and continue to be, a primary and critical channel for Headset sales to Contact Centers.  In addition to Headsets, SIDs stock a full array of products required by Contact Centers.  SIDs employ skilled sales and service people and provide a variety of services to their Contact Center customers, including regular ordering and restocking of inventory, new product demonstrations, returns and exchanges, technical know-how, and delivery services.

## DEFENDANT HAS MONOPOLY POWER

25.     Defendant currently holds and has always held a monopoly power in the relevant market.

26.     Upon information and belief, Defendant's Headsets account for in excess of 75% of Headset sales to Contact Centers in the United States.

27.     During Defendant's 2012 fiscal year, Defendant recognized net revenues of over $713,000,000.00.

28.     Due to Defendant's monopoly power, it possesses the power to control Headset prices in the relevant market and, as demonstrated below, the power to exclude competition.

## DEFENDANT'S RESTRICTIVE DEALING AGREEMENTS

29.     When GN began selling Headsets in the United States, it became Defendant's first significant competitor in the relevant market.

30.     Upon information and belief, in direct response to this new competition, Defendant introduced an agreement styled the Plantronics Only Distributor program ("POD") at least as early as 1997.

31.     POD agreements prohibit SIDs from marketing, advertising or promoting competing products in the relevant market and from purchasing competing products directly from competing manufacturers.  More specifically, upon information and belief, SIDs who enter into POD agreements are prohibited from:  (1) marketing, advertising, or promoting competitive products; (2) purchasing competing products directly from competitor manufacturers; and (3) accepting sales incentives from competing manufacturers.

32.     In return, Defendant provides SIDs, who enter into POD agreements, benefits not available to resellers which have not entered into POD agreements.  More specifically, upon information and belief, Plantronics provides SIDs who enter into POD agreements the following benefits: (1) the best pricing on Plantronics' products; (2) Plantronics makes significant investments in infrastructure and marketing in SIDs; and (3) Plantronics funnels sales leads to SIDs.

33.     Upon information and belief, among other things, Plantronics actively polices their dealers to ensure compliance and has threatened to terminate SIDs who violate the POD Agreements.

34.     Upon information and belief, a breach of the POD agreement by a SID would result in a loss of all benefits associated with the POD agreements.

35.     Upon information and belief, Defendant has targeted the largest SIDs and/or SIDs with substantial GN sales to enter into POD agreements.

36.     Upon information and belief, Plantronics has induced 80% of SIDs to enter into POD agreements.

37.     The POD agreements prohibit SIDs from freely marketing and selling GN's competitive products.

38.     The POD agreements create no market efficiency and serve no legitimate business purpose other than to stifle competition, discourage new market entrants, and artificially increase Defendant's market share.

39.     The POD agreements were designed to and have thwarted GN's and other competitors' attempts to build a viable distribution network, foreclosed their ability to compete in the relevant market, and prevented GN and other competitors from increasing market share.

40.     Competing Headset manufacturers, including GN, have no reasonable or effective means of competing with Defendant's monopoly on sales to the relevant market.

41.     Direct sales to Contact Centers are not a reasonable or adequate substitute for the SIDs, because Contact Centers want and need the various services and products the SIDs provide.  The vast majority of contact centers purchase headsets from SIDs.

42.     Absent access to the SIDs, competing manufacturers are not able to obtain or create effective, alternative channels of distribution to Contact Centers and accordingly cannot effectively compete in the relevant market.

## ANTICOMPETITIVE EFFECTS

43.     GN's parent corporation was founded more than 150 years ago in Denmark and entered the relevant market in or about 1987.

44.     Defendant, a United States company founded in the 1960s, has competed in and dominated the relevant market for 50 years.

45.     Defendant began competing in the European Headset market in 1994.

46.     GN was the majority competitor in the European Headset market long before 1994.

47.     Defendant competes successfully with GN in Europe and has grown a comparable market share.

48.     Upon information and belief, prior to Defendant's implementation of POD agreements, GN was able to grow their market share in the relevant market.

49.     The POD agreements have unfairly prevented GN from obtaining the comparable market share between the parties that exists in Europe in the relevant market.

50.     Defendant's POD agreements have effectively stifled competition in the relevant market.

51.     The POD agreements have discouraged and prevented the possible entry of competitors into the relevant market.

52.     Defendant's foreclosure to adequate distribution has successfully restricted competition in the relevant market for over ten years and, absent a court order, is likely to continue to foreclose competition and maintain/enhance Defendant's monopoly power.

53.     Defendant has imposed and enforces its restrictive dealing POD agreements for the purpose and with the effect of reducing or eliminating competition in the relevant market and maintaining its monopoly or attempting to monopolize the market.

54.     The harm to competition is severe.  SIDs who enter into a POD agreement are locked into selling Defendant's Headsets and lose the ability to promote competing brands to the

relevant market resulting in Contact Centers remaining locked into Defendant's products without the ability to freely consider competing products from GN and other Headset manufacturers.

55.     Upon information and belief, as a result of the absence of competition, the price of Headsets in the relevant market has remained artificially inflated.

56.     Defendant's POD agreements have resulted in higher prices, loss of choice, less market information, and lower quality of Headsets in the United States.  But for the POD agreements, other manufacturers of Headsets, including GN, would be able to obtain higher market shares.

57.     But for the POD agreements, additional Headset manufacturers would have attempted to enter the relevant market.

58.     But for the POD agreements, prices for Headsets in the relevant market would be lower.

59.     But for the POD agreements, Contact Centers would have a greater choice of Headsets and more market information about competing Headsets.

60.     But for the POD agreements, Contact Centers would have received lower-priced, higher-quality, and more desirable Headsets.

61.     Defendant's POD agreements will continue to prevent competing Headset manufacturers from access to SIDs, thus continuing to restrain price, quality, competition, and reduce consumer information and choice for Headsets in the relevant market.

62.     Defendant's conduct is not justified by efficiencies or legitimate business considerations.

63.     The harm being suffered by GN is immediate, because with each day that passes, GN is losing opportunities to compete on the merits in the relevant market.

8

64.    The harm to GN is irreparable because there is no way fully to measure GN's loss.

## COUNT I

## MONOPOLIZATION

65.    GN repeats, realleges and incorporates by reference the allegations set forth in paragraphs 1-64 as if fully set forth herein.

66.    The relevant market for this action is the sale of Headsets to Contact Centers in the United States of America.

67.    Upon information and belief, Defendant's Headsets account for in excess of 75% of Headset sales in the relevant market.

68.    Defendant's aforementioned deliberate conduct of excluding competition in the relevant market through the use of POD agreements constitutes willful maintenance of its monopoly power in the market of sales of Headsets to Contact Centers throughout the United States and constitutes unlawful monopolization in interstate commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

69.    The harm to competition or anticompetitive effect of Defendant's conduct includes keeping output below and prices above what they would be in the presence of unrestrained competition in the relevant market.  This results from Defendant's conduct which limits consumer choice, raises competitors' costs, and creates artificial barriers to entry from a necessary means of distribution.

70.    As a direct and proximate result of the foregoing, GN has been injured in its business and property, is threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendant is enjoined from soliciting, entering into, and enforcing POD agreements with SIDs, or from engaging in other practices, including, but not limited to any other similar exclusionary agreements, designed to foreclose and exclude GN

and other competitors from the market, and from engaging in other illegal conduct alleged herein.

## COUNT II

## ATTEMPTED MONOPOLIZATION

71.     GN repeats, realleges and incorporates by reference the allegations set forth in paragraphs 1-70 as if fully set forth herein.

72.     The relevant market for this action is the sale of Headsets to Contact Centers in the United States of America.

73.     Upon information and belief, Defendant's Headsets account for in excess of 75% of Headset sales in the relevant market.

74.     Defendant has the specific intent to monopolize the market of the sale of Headsets to Contact Centers throughout the United States.  Defendant's aforementioned deliberate conduct of excluding competition in the relevant market through the use of POD agreements has been undertaken to achieve, maintain and extend such monopoly, and to the extent that Defendant has not already obtained monopoly power, there is a dangerous possibility that it will succeed in obtaining it.

75.     Through the use of POD agreements, Defendant is attempting to monopolize the market of Headsets to Contact Centers throughout the United States in interstate commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

76.     The harm to competition or anticompetitive effect of Defendant's conduct includes keeping output below and prices above what they would be in the presence of unrestrained competition in the relevant market.  This results from Defendant's conduct which limits consumer choice, raises competitors' costs, and creates artificial barriers to entry from a necessary means of distribution.

77.     As a direct and proximate result of the foregoing, GN has been injured in its business and property, is threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendant is enjoined from soliciting, entering into, and enforcing POD agreements with SIDs, or from engaging in other practices, including, but not limited to any other similar exclusionary agreements, designed to foreclose and exclude GN and other competitors from the market, and from engaging in other illegal conduct alleged herein.

## COUNT III

## CONCERTED ACTION IN RESTRAINT OF TRADE

78.     GN repeats, realleges and incorporates by reference the allegations set forth in paragraphs 1-77 as if fully set forth herein.

79.     The relevant market for this action is the sale of Headsets to Contact Centers in the United States of America.

80.     Upon information and belief, Defendant's Headsets account for in excess of 75% of Headset sales in the relevant market.

81.     Defendant has entered into restrictive dealing agreements with Headset distributors, maintained and enforced these agreements, otherwise acted in concert with those distributors, and sold Headsets on the condition that those distributors refrain from marketing, advertising, or promoting competitive products or purchase products directly from competitors, thereby causing a substantial lessening of competition in the relevant market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

82.     Defendant has market power in the relevant market and Defendant has exercised and maintained that market power through the POD agreements.

83.     The harm to competition or anticompetitive effect of Defendant's conduct includes keeping output below and prices above what they would be in the presence of unrestrained competition in the relevant market.  This results from Defendant's conduct which limits consumer choice, raises competitors' costs, and creates artificial barriers to entry from a necessary means of distribution.

84.     As a direct and proximate result of the foregoing, GN has been injured in its business and property, is threatened with immediate and irreparable additional loss and damage, and will continue to be so threatened unless Defendant is enjoined from soliciting, entering into, and enforcing POD agreements with SIDs of Headsets to Contact Centers, or from engaging in other practices, including, but not limited to any other similar exclusionary agreements, designed to foreclose and exclude GN and other competitors from the market, and from engaging in other illegal conduct alleged herein.

85.     The sale of Headsets across state lines constitutes interstate commerce and, further, POD agreements substantially affect interstate commerce.

## COUNT IV

### TORTIOUS INTERFERNCE WITH BUSINESS RELATIONS
### (DELAWARE COMMON LAW)

86.     GN repeats, realleges and incorporates by reference the allegations set forth in paragraphs 1-85 as if fully set forth herein.

87.     Defendant had existing business relationships with certain dealers of Headsets and potential business relationships with others interested in working with GN.

88.     Defendant had knowledge of GN's existing business relationships and potential business relationships with others interested in working with GN.

89.     Defendant knowingly, intentionally, wrongfully, and maliciously interfered with GN's advantageous business relationships.

90.     Defendant's actions have harmed GN's business relationships with current dealers and potential dealers.  GN's loss of these advantageous business relations resulted directly from Defendant's improper and unlawful actions.

91.     GN has suffered substantial damages, in an amount to be determined at trial, as a result of Defendant's improper and unlawful actions.

### REQUEST FOR RELIEF

WHEREFORE, GN prays for judgment:

A.  Enjoining Defendant from soliciting, entering into or enforcing exclusionary agreements which prohibit SIDs from marketing, advertising, or promoting competing products, purchasing products directly from competitors, or otherwise impairing their ability to carry and sell GN and other competing products;

B.  Enjoining Defendant from taking any action or threatening to take any action against SIDs or others who carry GN or other competing products;

C.  Enjoining Defendant from engaging in any other exclusionary practices which directly or indirectly foreclose GN and other competitors from distributing Headsets;

D.  Awarding GN damages in an amount to be determined, and trebled as provided for in Section 4 of the Clayton Act, 15 U.S.C. § 15;

E.  Awarding GN the cost of this suit, including reasonable attorneys' fees, as provided for in Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and

F.  Granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  October 12, 2012

FARNAN LLP

/s/ Michael J. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street
12th Floor
Wilmington, DE  19801
(302) 777-0336
(302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Counsel for Plaintiff GN Netcom, Inc.

Of Counsel:
Christopher S. Finnerty
Jeffrey S. Patterson
Michael R. Murphy
Morgan T. Nickerson
NELSON MULLINS RILEY & SCARBOROUGH, LLP
One Post Office Square, 30th Floor
Boston, MA 02109
(617) 573-4700
(617) 573-4710 (Fax)
chris.finnerty@nelsonmullins.com
jeffrey.patterson@nelsonmullins.com
michael.murphy@nelsonmullins.com
morgan.nickerson@nelsonmullins.com