**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GN NETCOM, INC., | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 12-1318-LPS |
| PLANTRONICS, INC., | : | |
| Defendant. | : | |

Joseph J. Farnan, Jr., Esq., Brian E. Farnan, Esq., Michael J. Farnan, Esq., FARNAN LLP, Wilmington, DE.
Christopher S. Finnerty, Esq., Jeffrey S. Patterson, Esq., Michael R. Murphy, Esq., Morgan T. Nickerson, Esq., NELSON MULLINS RILEY & SCARBOROUGH, LLP, Boston, MA.

Attorneys for Plaintiff GN Netcom, Inc.

Richard L. Horwitz, Esq., John A. Sensing, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, DE.
Jonathan M. Jacobson, Esq., Chul Pak, Esq., David H. Reichenberg, Esq., Robert Corp, Esq., WILSON SONSINI GOODRICH & ROSATI PC, New York, NY.

Attorneys for Defendant Plantronics, Inc.

**MEMORANDUM OPINION**

September 23, 2013
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiff GN Netcom, Inc. ("GN" or "Plaintiff") filed this action on October 12, 2012, accusing Defendant Plantronics, Inc. ("Plantronics"or "Defendant") of monopolization, attempted monopolization, restraint of trade, and tortious interference with business relations. (D.I. 1) On December 5, 2012, Plantronics moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim. (D.I. 8) The Court conducted a hearing on June 24, 2013. (D.I. 19) (hereinafter "Tr.") For the reasons set forth below, the Court will deny Plantronics' motion.

## I. LEGAL STANDARDS

The sufficiency of pleadings for non-fraud cases is governed by Rule 8 of the Federal Rules of Civil Procedure, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court is required to conduct a two-part analysis. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the Court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. This first step requires the Court to draw all reasonable inferences in favor of the non-moving party. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2000). However, the Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

Second, the Court must determine "whether the facts alleged in the complaint are

sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This is a context-specific determination, requiring the Court "to draw on its judicial experience and common sense." *Id.* at 679. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks omitted). Finally, although a non-fraud claim need not be pled with particularity or specificity, that claim must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 555.

## II. DISCUSSION

With respect to the monopolization and attempted monopolization claims, Plantronics contends that GN has failed to: (1) allege an antitrust injury; and (2) properly define the relevant market. For the restraint of trade claim, Plantronics alleges that GN has failed to allege any anti-competitive conduct. Plantronics also contends that GN has not stated a claim for tortious interference.

### A. Antitrust Injury

In order to sue for an antitrust violation, a plaintiff must demonstrate that it has suffered

an antitrust injury. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To establish an antitrust injury, a plaintiff must show: "(1) harm of the type the antitrust laws were intended to prevent; and (2) injury to the plaintiff that flows from that which makes the defendant's acts unlawful." *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3rd Cir. 2010); *see also Brunswick*, 429 U.S. at 489.

### 1. Harm

An "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 283 (3d Cir. 2012). As such, the Court begins its analysis by examining the industry in which the parties compete, taking as true the well-pleaded factual allegations of the Complaint. The Complaint alleges a specialized market for headsets sold to Contact Centers in the United States. (Complaint at ¶ 6) Plantronics' headsets currently account for over 75% of headset sales in this market. (*Id.* at ¶ 26) According to GN, a "vast majority" of Contact Centers purchase their headsets through a limited network of approximately 20 specialized independent distributors ("SIDs"). (*Id.* at ¶¶ 23, 41) The SIDs are a "primary and critical" channel for headset sales to Contact Centers in the U.S. (*Id.* at ¶ 24)

GN entered the relevant market in 1997 and is Plantronics' first significant competitor. (*Id.* at ¶ 29) In response to GN's entry into the market, Plantronics introduced the Plantronics Only Distributor ("POD") program,[1] which prohibits SIDs from: "(1) marketing, advertising, or promoting competitive products; (2) purchasing competitive products directly from competing

---

[1]For purpose of the pending motion, Plantronics agrees that the Court should treat POD agreements as exclusive dealing arrangements. (Tr. at 4)

manufacturers; and (3) accepting sales incentives from competing manufacturers." (*Id.* at ¶¶ 30, 31) As of the date of the Complaint, Plantronics had induced approximately 80% of SIDs to become Plantronics Only Dealers. (*Id.* at ¶ 36) GN alleges that Plantronics' POD agreements have caused an antitrust injury by: (1) preventing entry of new competitors into the market; (2) decreasing consumer options and information about available competing products; and (3) causing the price of the products to remain artificially inflated. (*Id.* at ¶¶ 53-61) The Court concludes that these allegations are sufficient to allege antitrust injury under the relevant antitrust laws. *See, e.g., International Raw Materials v. Stauffer Chem. Co.*, 978 F.2d 1318, 1328 (3d Cir. Pa. 1992) (finding that "allegation of decreased competition in the [relevant] market is the type of harm targeted by the antitrust laws"); *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (same).

Plantronics asks the Court to focus on the benefits of PODs, contending that these benefits evidence the agreement's pro-competitive nature.[2] According to Plantronics, "exclusivity is simply an outcome of the competitive process."[3] (D.I. 14 at 5) However, exclusive agreements are not always pro-competitive, even where they provide some benefits. *See ZF Meritor*, 696 F.3d at 289. To the contrary, exclusive dealing agreements can result in an antitrust injury "by allowing one supplier of goods or services unreasonably to deprive other

---

[2]Although Plantronics attached an unauthenticated POD agreement to its Opening Brief (D.I. 10), Plantronics is no longer relying on this exhibit for purpose of this motion. (Tr. at 9)

[3]Plantronics also contends that an antitrust injury cannot result "from agreements that can be terminated with ease." (D.I. 14 at 2) But whether SIDs have an actual choice in terminating Plantronics' POD agreements is a factual question that will only be resolved following discovery. *See, e.g., United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005) (finding harm to competition "in spite of the legal ease with which the relationship can be terminated," because "the dealers have a strong economic incentive to continue" with relationship).

suppliers of a market for their goods." *Id.* at 270. As the Third Circuit explained in *ZF Meritor*:

> [S]uppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival. A set of strategically planned exclusive dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.

*Id.* at 271.

In its Complaint, GN alleges that Plantronics introduced its POD agreements in direct response to GN's entry into the market, preventing GN and other competitors from building a viable distribution network and competing with Plantronics' monopoly. (Complaint at ¶¶ 30, 39, 40) For purpose of Plantronics' motion to dismiss, the Court must accept the well-pleaded facts of the Complaint as true and give GN the benefit of all logical inferences. *See Fowler*, 578 F.3d at 210-211. Under this standard, and taking into account the nature of the market in which the parties compete, the Court concludes that GN has properly pled an antitrust injury.

Plantronics also relies on *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 454 (6th Cir. 2007), arguing that "[n]othing in the Complaint suggests that GN Netcom has been prevented from competing for the business of any distributor." (D.I. 14 at 4) The argument, however, ignores the demands of the marketplace in which the respective agreements arose. In *NicSand*, industry practices required suppliers to offer retailers exclusive agreements, and the defendants there merely complied with that requirement by offering a more lucrative exclusive deal. *See* 507 F.3d at 454. The Court in *NicSand* recognized the unique nature of that industry, concluding that "[i]f retailers have made supplier exclusivity a barrier to entry, one cannot bring an antitrust claim against a supplier for acquiescing to that requirement." *Id.* Marketplace realities in this case,

however, are quite different. According to the Complaint, Plantronics only introduced the POD agreements ***in response to*** GN's entry into the marketplace, creating a barrier to the market that did not previously exist. (Complaint at ¶ 30) Hence, again, GN has adequately pled antitrust injury.

**2. Injury to Plaintiff**

The second prong of the antitrust injury analysis requires allegation of an "injury to the plaintiff that flows from that which makes the defendant's acts unlawful." *Brunswick*, 429 U.S. at 489. "Th[is] second requirement is generally met if the plaintiff is a competitor or a consumer in the relevant market." *Gulfstream*, 995 F.2d at 429 (internal citation and quotation marks omitted). Because GN has pled that it is a direct competitor of Plantronics in the relevant market, the second prong of the test also is satisfied.

**B. Relevant Market**

Plantronics contends that GN has failed to properly define the relevant market. (D.I. 9 at 9-13) "[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997). As such, motions to dismiss based on a failure to define the market "may be granted only if the alleged market makes 'no economic sense under any set of facts.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *6 (S.D.N.Y. Aug. 27, 1998). "Absent an inherently implausible market allegation, the question must be resolved on the facts and economic realities of the case." *Id.*

For purposes of antitrust law, a relevant market definition can include both a product component and a geographic component. *See Brown Shoe Co. v. United States*, 370 U.S. 294,

324 (1962). GN alleges: "The relevant market for this action is the sale of corded and wireless headsets ('Headsets') to Enterprise Contact Centers ('Contact Centers') in the United States of America." (Complaint at ¶ 6) Plantronics challenges both the product and geography components of GN's market definition. (D.I. 9 at 9)

**1. Product Market**

Plantronics contends that GN has improperly restricted the product market to only headsets sold to "Contact Centers." (D.I. 9 at 9-12) According to Plantronics, "[t]he Complaint alleges no facts at all as to why headsets sold to other locations or to other customers (such as offices) are not in the same relevant market as those sold to Contact Centers." (D.I. 9 at 10) The Court disagrees.

As explained by the Supreme Court in *Brown Shoe*, 370 U.S. at 325, the boundaries of a market may be established by reference to such practical factors as "industry or public recognition of the []market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Courts have further held that "it is appropriate to limit a market to a discrete channel of distribution so long as it is shown, using established market-definition criteria, that enough customers do not view other methods of distribution as viable substitutes to the distribution method in question." *PepsiCo*, 1998 WL 547088, at *8 (summarizing relevant case law).

In this case, under the established market-definition criteria, GN's Complaint provides sufficient factual detail to support its proposed market definition. As explained in the Complaint, the headsets at issue here are sold to Contact Centers through a limited network of approximately

20 SIDs. (Complaint at ¶ 23) According to the Complaint, SIDs "provide a variety of services to their Contact Center customers, including regular ordering and restocking of inventory, new product demonstrations, returns and exchanges, technical know-how, and delivery services." (*Id.* at ¶ 24) The Complaint further alleges that "[t]he parties have specialized sales and marketing strategies for purchases by Contact Centers." (*Id.* at ¶ 15) Finally, GN notes that Plantronics' own documents refer to the "contact center market."[4] (D.I. 13 at 14) Accepting the allegations in the Complaint as true, and taking the economic realities of the industry into account, the Court concludes that GN's market definition is not "inherently implausible" and, thus, is adequate for pleading purposes.

**2. Geographic Market**

Plantronics likewise challenges GN's market definition on geographical grounds, contending that the market is improperly restricted to the United States. (D.I. 9 at 12) According to Plantronics, "There is nothing at all to explain why the proper geographic market for headsets is anything other than worldwide." (D.I. 9 at 13) The Court disagrees. The Complaint alleges that "warranty differences," "voltage differences," and "shipping costs" make it "impracticable for Contact Centers to purchase Headsets from suppliers outside the United States of America." (Complaint at ¶¶ 16-20) Accepting the allegations in the Complaint as true, the Court cannot conclude that GN's restriction of the market to the U.S. "makes 'no economic sense under any set of facts.'" *PepsiCo*, 1998 WL 547088, at *6. Again, GN's market definition is adequately pled.

---

[4]While GN concedes that Plantronics' SEC documents by themselves may not be sufficient to establish a relevant market, GN offers the documents as evidence of "industry recognition," which is one of the "market-defining" factors in *Brown Shoe*. (*See* Tr. at 38)

### C. Other Asserted Grounds

Plantronics has raised two additional grounds for dismissal: (1) failure to allege any anti-competitive conduct; and (2) failure to state a claim for tortious interference. There seems to be little dispute that the outcome with respect to these two issues is dependent on the Court's conclusion regarding antitrust injury. (*See* Tr. at 45-46) Having found that GN has adequately alleged antitrust injury, the Court will likewise deny Plantronics' motion with respect to GN's restraint of trade and tortious interference claims.

## III. CONCLUSION

Plantronics' motion will be denied. An Order consistent with this Memorandum Opinion will be entered.