# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GN NETCOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> PLANTRONICS, INC., <br><br> Defendant. | C.A. No. 12-1318-LPS |

## MEMORANDUM ORDER

At Wilmington this **29th** day of **September, 2017**:

1. ***Background.*** The parties to this antitrust litigation are competitors in the market for telephone headsets sold to "enterprise" (also known as "contact center and office" or "CCO") end-users. Plaintiff GN Netcom, Inc. ("GN") filed this lawsuit on October 12, 2012, alleging claims of monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and common-law tortious interference with business relations against Defendant Plantronics, Inc. ("Plantronics"), based on Plantronics' implementation and enforcement of its Plantronics Only Distributor ("POD") program for distributors of its headsets. (D.I. 1 at ¶¶ 65-91) Headsets are generally not sold directly from manufacturers to CCO end-users but, rather, through one or two layers of distributor intermediaries. Up until 2014, distributors in the POD program ("PODs") were restricted in two ways: (i) they were not permitted to purchase headsets directly from Plantronics' competitors; and (ii) they could not "actively . . . promote rival headset brands," through, for example,

1

"advertising or placement on the POD website." (D.I. 399 at 3)[1] GN alleges that these "exclusivity restraints" had an "anticompetitive purpose and impact on the marketplace." (D.I. 455 at 2-3)

       2.      On September 23, 2013, the Court denied Plantronics's Motion to Dismiss, finding that: (1) GN and Plantronics are direct competitors in the relevant market; (2) GN had adequately pled antitrust injury; (3) GN's market definition was adequate for pleading purposes; (4) GN had adequately alleged anti-competitive conduct; and (5) GN had adequately pled tortious interference. (D.I. 20; D.I. 21 (*GN Netcom, Inc. v. Plantronics, Inc.*, 967 F. Supp. 2d 1082 (D. Del. 2013)) On July 6, 2016, in light of Plantronics' "intentional and admitted deletion of emails," which was carried out "in bad faith with the intent to deprive GN from using the information contained" therein, the Court imposed monetary and evidentiary sanctions on Plantronics, including a permissive adverse inference instruction to be given at trial. (*See* D.I. 333) Plantronics was also required to seek leave if it wished to file a motion for summary judgment, given the impact that the spoliation – and the permissive adverse inference – could have on the appropriate resolution of any such motion. (*See* D.I. 348; D.I. 349 at 35)

       3.      On December 8, 2016, Plantronics sought leave from the Court to move for summary judgment on three independent grounds. (*See* D.I. 371) The Court allowed Plantronics to proceed solely on the first issue (*see* D.I. 385 at 48-49): "whether GN's ability to reach end-users directly negates the essential element of significant market foreclosure" (D.I. 399 at 1). Plantronics filed its motion for summary judgment, which is directed to all of GN's claims,

---

[1] In 2014, Plantronics removed the program's ban on direct purchases and relaxed the prohibition on promotion. (*See* D.I. 399 at 4)

on April 13, 2017. (D.I. 398) The parties have fully briefed the motion (*see* D.I. 399, 455, 462) and the Court heard oral argument on August 29, 2017 (*see* D.I. 484 ("Tr.")).

4. ***Legal Standards***. Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

5. ***Antitrust Scrutiny of Exclusive Dealing Arrangements***. The requirements of anticompetitive conduct and antitrust injury are common to all of GN's antitrust claims. *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016). Exclusive dealing

arrangements are "express or *de facto* agreement[s] in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *Id.* at 403 (internal quotation marks omitted). While a "threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing, . . . an express exclusivity requirement is not necessary because *de facto* exclusive dealing may be unlawful." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282 (3d Cir. 2012). Because such arrangements are often beneficial to consumers, they are not inherently unlawful, and allegations of anticompetitive conduct arising from such agreements are analyzed under the rule of reason. *Eisai*, 821 F.3d at 403; *see also ZF Meritor*, 696 F.3d at 281. Thus, the relevant question is whether the arrangements in question "substantially lessen competition," as opposed to "merely disadvantage rivals." *ZF Meritor*, 696 F.3d at 271.

There is no "set formula" for answering this question. *Id.* But two important considerations come into play. First, courts must examine "whether a plaintiff has shown substantial foreclosure of the market for the relevant product." *Eisai*, 821 F.3d at 403. Substantial foreclosure occurs when the "challenged practices . . . severely restrict the market's ambit." *Id.* (internal quotation marks omitted). Second, courts must also assess "the likely or actual anticompetitive effects of the exclusive dealing arrangement, including whether there was reduced output, increased price, or reduced quality in goods or services." *Id.*[2]

---

[2]The parties dispute whether substantial foreclosure is an "essential element" of GN's antitrust claims. (*Compare, e.g.*, D.I. 455 at 5-9 (GN arguing that "even if a Court were to find that no foreclosure existed because a manufacturer could sell directly to end-users, it must also analyze whether there is evidence to show that the monopolist used it market power to break the competitive process") *with* D.I. 462 at 1-2 (Plantronics responding that "the ***only*** conduct at issue in this case is the POD agreements, and the ***only*** purported injury to GN is 'foreclosure' resulting from those agreements," making foreclosure a necessary but not sufficient condition for GN to

6. Plantronics' argument for summary judgment is fairly simple. Plantronics contends that any foreclosing effect of its POD agreements was "negate[d]" by GN's ability to circumvent the PODs and access end-users directly. (D.I. 399 at 9) Specifically, "GN can make sales calls directly to end-users, with delivery effected by any of the hundreds of resellers GN uses," including the PODs themselves. (D.I. 462 at 3 (emphasis omitted)) As support for this proposition, Plantronics refers to GN's recent, successful history of reaching out to enterprise end-users in this manner ("solution selling"), which has resulted in significant "wins" and market share growth for GN. (*See, e.g.*, D.I. 399 at 6; *see also* D.I. 362 at 4)

7. In opposing summary judgment, GN analogizes this case to *United States v. Dentsply International, Inc.*, 399 F.3d 181 (3d Cir. 2005), in which the Court of Appeals for the Third Circuit found that the government was entitled to relief under Section 2 of the Sherman Act. GN asserts that, as in *Dentsply*, the distributors in the CCO headset market "control access to end-users," that their networks are "long entrenched," and that "end-users are loyal to their chosen distributor." (D.I. 455 at 12) GN argues that these relationships mean that "headset sales through different distributors are not interchangeable; GN cannot reach the same end-users by engaging them through other non-POD distributors." (*Id.* at 15-16) GN further contends that

---

prevail here)) At oral argument, counsel for GN conceded that GN would "have to show [it] did not have effective access to a share of customers in order to win the case." (Tr. at 37) The Court further held, in this particular case, GN "is going to have to show substantial foreclosure in the relevant market based on the defendant's conduct" and "it is not clear . . . at this point that [GN] even disputes that." (Tr. at 73; *see also generally United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) ("The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, the opportunities for other traders to enter into or remain in that market must be significantly limited. . . . [A]n exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition[; thus,] the requirement of a significant degree of foreclosure serves a useful screening function.") (internal quotation marks omitted))

expanding its distribution efforts by using PODs would have been futile because PODs were "expected to flip" their GN customers to Plantronics products. (*Id.* at 16) GN's view is that it has been "effectively denied access" to end-users who buy through PODs,[3] and Plantronics' proffered alternative mechanisms of distribution that GN could purportedly use are impractical – or, at minimum, there is a genuine factual dispute as to their practicality. (*Id.*)[4]

8.	The core question presented by this motion is whether, taking the evidence in the light most favorable to GN, Plantronics has demonstrated that a reasonable juror could find only that GN had adequate "available," "viable," and/or "effective" alternative means of distribution, notwithstanding Plantronics' POD program. (*See* Tr. at 10-11, 32) The "mere existence of other avenues of distribution" is not enough on its own. *Dentsply*, 399 F.3d at 196. Instead, there must be an "assessment of [the alternative means'] overall significance to the market," and such alternative means must be "practical or feasible in the market as it exists and functions." *Id.* at

---

[3]The parties strongly dispute the extent of the PODs' coverage of the relevant market(s), and even disagree as to how many distributors should be counted as PODs. (*See, e.g.*, D.I. 485, 486) The Court need not resolve this disagreement because the limited basis on which Plantronics has been granted leave to seek summary judgment (and the relevant question posed by the pending motion) does not concern the amount of alleged foreclosure. Rather, the sole basis on which the Court agreed to consider summary judgment is "whether GN"s ability to reach end-users directly negates the essential element of significant market foreclosure." (D.I. 399 at 1) Hence, even taking as true Plantronics' contentions (which GN disputes) that "GN has substantial participation in all of the major resellers" (Tr. at 12), and "well over 70% of the distribution volume is available to GN at all times" (D.I. 462 at 6), these "facts" would not be bases for case-dispositive relief at this stage of the proceeding unless Plantronics could show (which it has not) that GN's ability to reach end users precludes GN from proving, by a preponderance of the evidence, to a reasonable jury, significant market foreclosure.

[4]GN contends that "direct sales" to end-users (i.e., circumventing the distribution "layer" entirely) are "logistically impossible." (*E.g.*, D.I. 455 at 14-15) That, however, is not the alternative distribution model that Plantronics identifies, which instead involves direct ***marketing*** to end users while still employing distributors for sales and distribution. (*See, e.g.*, D.I. 462 at 2-3)

193-96.  (*See also* Tr. at 11 (counsel for Plantronics acknowledging that "the alternative means of reaching end-users . . . must be effective" and "viable" and, even if not equivalent to Plantronics' distribution, must be "sufficient for the rival to compete for the business in issue"))

In attempting to persuade the Court to grant its motion, Plantronics focuses on the perspective of end-users, and emphasizes that there is no evidence in the record that end-users felt coerced or otherwise unable to acquire the products they wished to acquire at will, including GN products.  (*See, e.g.*, D.I. 399 at 18)  In *Eisai,* on which Plantronics relies heavily, the Third Circuit focused its "concern . . . not [on] which products a consumer chooses to purchase," but instead on assessing "which products are reasonably available to that consumer."  821 F.3d at 403.  In other words, "if customers are free to switch to a different product in the marketplace but choose not to do so, competition has not been thwarted – even if a competitor remains unable to increase its market share."  *Id.*  But *Eisai* also emphasized there is "no set formula," *id.*, necessitating careful attention be paid to the particulars of each case, and it is not clear (resolving all disputed facts in GN's favor and drawing all reasonable inferences for GN as well) that the facts here must be found to be analogous to those in *Eisai*.

That is, it is not sufficiently clear on the record here that this case must turn simply on whether the CCO end-users were reasonably free to choose between alternative products.  *See generally LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (listing "the extent to which customers felt they were precluded from dealing with other manufacturers" as merely one among several factors relevant to ascertaining "anticompetitive effect of a defendant's conduct under the Sherman Act").  Particularly in cases involving accused monopolists and Sherman Act Section 2 claims, courts have considered whether the restraints complained of "help[] keep sales of

7

competing [products] below the critical level necessary for any rival to pose a real threat to [the defendant's] market share" and further have a "significant effect in preserving [the defendant's] monopoly." *Dentsply*, 399 F.3d at 191; *see also id.* at 193 ("The proper inquiry is not whether direct sales enable a competitor to 'survive' but rather whether direct selling 'poses a real threat' to defendant's monopoly.") (quoting *Microsoft*, 253 F.3d at 71).

9. ***Distribution through PODs***. As noted above, Plantronics argues that GN had two principal paths around the POD restrictions. First, GN could have marketed directly to POD customers and then relied on the PODs for distribution, as it is undisputed that "PODs have never been prevented from selling GN and other products when end-users request" those competing products. (Tr. at 9) In fact, one of GN's largest resellers by volume is a POD. (*See* D.I. 400 A293-94) While a reasonable jury could find that GN is not substantially foreclosed from selling in this manner through PODs, a jury would not be compelled to make such a finding, meaning there is a genuine dispute of material fact as to whether distribution through PODs is adequately "practical or feasible" for GN. This is not, then, an appropriate basis for summary judgment.

While several major GN resellers are PODs (or alleged by GN to be PODs), the jury may reasonably find a striking disparity between GN's share of sales carried out through PODs and those it is able to make through non-PODs. (*See* D.I. 455 at 11 n.8) This evidence could reasonably be found to support GN's claim that PODs naturally convert GN business to Plantronics business over time and that, "even though PODs may nominally be permitted to sell GN products, in practice they are supposed to minimize GN sales." (D.I. 455 at 17) At bottom, Plantronics cannot meet the summary judgment standard to show that the only reasonable conclusion to be drawn from the record is that distribution through PODs is an adequately

8

available, viable, and/or effective means of distribution for GN.

10. ***Distribution through non-PODs***. Second, Plantronics suggests that GN could reach out to POD customers directly and then utilize GN's own significant distribution network, as "any number of resellers will jump to support the sale." (D.I. 399 at 7) Plantronics repeatedly asserts that "GN has not identified, and cannot identify, a single instance of a lost sale because of the POD program or because [GN] lacked access to a suitable reseller or distributor." (*Id.* at 8 (emphasis omitted)) GN responds that it has "identified a 47 percent market foreclosure which includes hundreds, if not thousands of end-user sales" for which it believes it was effectively precluded from competing. (Tr. at 31)

While Plantronics has shown that the record contains substantial evidence from which a jury might reasonably find that GN could adequately compete for the business of any (and possibly even all) end-user(s), Plantronics has failed to show that this is the only conclusion a jury could reasonably reach. As GN argued at the motions hearing, Plantronics' proposed means for GN to compete would require extensive work on GN's part to reach thousands of end-users; the potential inefficiencies are "obvious." (Tr. 29) In pursuing sales to customers of PODs, for distribution by non-PODs, GN would not have an established distribution partner with whom to coordinate and "jointly market" its products. (Tr. 35) GN points to evidence in the record that distributors are often not interchangeable, due in part to longstanding relationships between end-users and distributors. (*See generally* D.I. 455 at 15-16; Tr. at 28-29) To be sure, a reasonable factfinder might conclude that these are merely the sorts of inconveniences to GN that arise from broadly beneficial and ultimately pro-competitive conduct on the part of Plantronics. But it is possible that it could reach the opposite conclusion.

11. ***Conclusion.*** Ultimately, there is "more than . . . some metaphysical doubt," *Matsushita*, 475 U.S. at 586, as to whether the alternative means of distribution that Plantronics proposes are "practical" and would "pose[] a real threat" to Plantronics' market share, *Dentsply*, 399 F.3d at 193. Therefore, Plantronics has not carried its burden on the motion it was granted leave to file, and the Court will deny that motion.

Accordingly, for the reasons stated above, **IT IS HEREBY ORDERED** that:

    A. Defendant Plantronics' motion for summary judgment (D.I. 398) is **DENIED**.

    B. As this Memorandum Order has been filed under seal, the parties shall meet and confer and submit, no later than October 2, a proposed redacted version of it, should they feel they have good cause to request that any portion of it remain sealed. Thereafter, the Court will issue a public version.

_____
HON. LEONARD P. STARK
UNITED STATES DISTRICT JUDGE