## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GN NETCOM, INC.,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        C.A. No.  12-1318-LPS
                                    )
PLANTRONICS, INC.,                  )
                                    )
                Defendant.          )

## <u>JURY INSTRUCTIONS</u>

## 1.    Introduction

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. I will start by explaining your duties and the general rules that apply in every civil case. I will explain some rules that you must use in evaluating particular testimony and evidence. I will explain the positions of the parties and the law you will apply in this case. Last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say. In following my instructions you must follow all of them and not single out some and ignore others. They are all important.

You will have your written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## 2.    **Jurors' Duties**

You have two duties as a jury.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on each of the issues presented.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly and impartially. Do not let any bias, sympathy, prejudice, fear, or public opinion influence you.  Nothing I say now, and nothing I may do or say during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

## 3.   Burden of Proof

In any legal action, facts must be proven by a required weight of the evidence, known as the "burden of proof." In this case, the burden of proof is called "preponderance of the evidence." This is a civil case in which GN claims that Plantronics violated the antitrust laws of the United States. GN has the burden of proving its claims by what is called a preponderance of the evidence. That means GN has to produce evidence which, when considered in light of all of the facts, leads you to believe that what GN alleges is more likely true than not. To put it differently, if you were to put the evidence of GN and Plantronics on opposite sides of a scale, the evidence supporting GN's claims would have to make the scale tip somewhat on GN's side. If the evidence is evenly balanced, the party has not proven the element by a preponderance of the evidence and you must find against that party. If GN fails to meet this burden, your verdict must be for Plantronics. If GN tips the scale slightly in its favor and carries its burden, your verdict must be for GN.

3

4.    **Evidence Defined**

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath either here at trial or at a deposition that has been presented to you, the exhibits that I allowed into evidence, the stipulations to which the lawyers agreed, and any facts that I have judicially noticed.

The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. The notes taken by any juror are not evidence.

During the trial I may not have let you hear the answers to some of the questions the lawyers asked. I may also have ruled that you could not see some of the exhibits that the lawyers wanted you to see. Further, sometimes I may have ordered you to disregard things that you saw or heard, or struck things from the record. You must follow my rulings and completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

During the course of the trial, if I instructed you that I admitted certain testimony and certain exhibits for a limited purpose, you may consider such evidence only for the specific limited purposes for which it was admitted. When I give instructions regarding that limited purpose, you must follow it.

4

You must not seek out or rely upon any materials other than those you receive here in court. In particular, you must not conduct internet searches or otherwise attempt to find information about the case or the parties other than what you are given in court.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

5.   **Spoliation**

     I instruct you that Plantronics failed to preserve evidence after its duty to preserve arose. This failure to preserve is known as "spoliation of evidence." In other words, spoliation is the destruction or material alteration of evidence or the failure to preserve evidence for another's use in pending or reasonably foreseeable litigation.

     Based on Plantronics' spoliation, you may, but are not required, to presume that the lost evidence would have been relevant and helpful to GN's case and/or would have been harmful to Plantronics' case. Alternatively, you may infer that the evidence not produced would merely have been duplicative of, or similar to, the evidence before you.

     In other words, your role is to determine whether Plantronics' spoliation tilted the playing field against GN. If so, the permission given to you by the Court to infer that the missing documents would have been relevant and helpful to GN and/or harmful to Plantronics is designed to allow you to balance that playing field, should you feel it is necessary.

     It is up to you to decide the extent to which the lost evidence was relevant and helpful to GN and/or harmful to Plantronics. Of course, it is impossible to know exactly what evidence was lost – although the parties have tried – so you must make these determinations to the best of your ability based on all of the facts and circumstances of this case. You must then decide how much weight and effect to give to your belief about spoliation in reaching your verdict.

6.    **<u>Consideration of Evidence</u>**

You should use your common sense in weighing the evidence.  Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## 7.   Direct and Circumstantial Evidence

There are two kinds of evidence: direct evidence and circumstantial evidence.  Direct evidence is evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact.  For example, if a witness testified that she saw it raining outside, and you believed her, that would be direct evidence that it was raining.

Circumstantial evidence is indirect proof of a fact, i.e., proof of facts from which you may infer or conclude that other facts exist.  For example, if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say one type of evidence is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

8.    **Statements of Counsel**

A further word about statements and arguments of counsel: the attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented. If you remember the evidence differently from the attorneys, you should rely on your own recollection.

The role of attorneys is to zealously and effectively advance the claims of the parties they represent within the bounds of the law. An attorney may argue all reasonable conclusions from evidence in the record. It is not proper, however, for an attorney to state an opinion as to the truth or falsity of any testimony or evidence. What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence that an attorney has offered during opening or closing statements, or at any other time during the course of the trial.

9.   **Credibility of Witnesses**

You are the sole judges of each witness's credibility. You may believe everything a witness says, or part of it, or none of it. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is in light of all the evidence; whether other evidence contradicted the witness's testimony; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and any other factors that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all. But if you can't do this, then it is your duty and privilege to believe the testimony that, in your judgment, is most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there is evidence tending to prove that the witness testified falsely about some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony he or she gave at trial or during a deposition. You have the right to distrust such witness's testimony and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement, you must consider whether it was an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail. This instruction applies to all witnesses, including expert witnesses.

10.    **<u>Number of Witnesses</u>**

One more point about the witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.  Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

11.   **<u>Expert Witnesses</u>**

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—called an expert witness—is permitted to state his or her opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. The fact that an expert states a fact or an opinion does not mean that the testimony is correct or supported by the factual evidence.  Expert testimony is a guide to interpreting the evidence. What the facts are is for you to decide.

Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.  You are free to accept or reject the testimony of experts, just as with any other witness.

## 12.   Lay Opinion Testimony

Witnesses who were not testifying as experts, may have given their opinions during the trial. The fact that a witness has stated an opinion does not mean you are required to accept it. You may give the opinions whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion. You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence. You should remember that lay witnesses may not testify to hypothetical situations or respond to hypothetical questions and should therefore disregard any opinions relating to hypotheticals.

**13.**   <u>**Depositions as Substantive Evidence**</u>

During this trial, you have heard testimony from the playing of videotape excerpts or the reading of written excerpts from depositions. If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony. However, the parties and the Court have conferred regarding what portions of deposition videos are to be played. You should therefore not attribute any significance to the fact that deposition videos may appear to have been edited.

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

Deposition testimony is entitled to the same consideration and is to be judged, as much as possible, in the same way as if the witness testified in person here in the courtroom.

14

14.   **Rule 30(b)(6) Deposition Testimony**

      In this trial, there were certain witnesses identified as "Rule 30(b)(6)" witnesses. These witnesses were designated to speak on certain topics at depositions on behalf of the entities which designated them as 30(b)(6) witnesses. Rule 30(b)(6) witnesses are required to testify about information known or reasonably available to the designating entity. For answers within the designated topics, the entity is bound by the answers of its Rule 30(b)(6) deponents.

**15.**    **Demonstrative Exhibits**

During the course of the trial, you have seen many exhibits.  Many of these exhibits were admitted as evidence.  You will have these admitted exhibits in the jury room for your deliberations.  The other exhibits (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses.  These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence.  Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

16.    <u>Use of Notes</u>

You may use notes taken during trial to assist your memory. However, you should use caution in consulting your notes. There is always a tendency to attach undue importance to matters that you have written down. Some testimony that is considered unimportant at the time presented, and thus not written down, takes on greater importance later on in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

17.   **The Parties' Contentions**

Plaintiff GN Netcom, Inc. filed this lawsuit against Plantronics, Inc. for alleged antitrust

violations.  GN alleges that Plantronics' Plantronics-Only-Distributor Program, coupled with its

dominant market position, violates federal antitrust law.  GN claims that the Plantronics-Only-

Distributor Program unfairly harms competition by prohibiting dealers from buying directly from

a competitor, such as GN, and by forbidding dealers from promoting or advertising competing

products.  GN has several claims against Plantronics, including:  (1) monopolization in violation

of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization in violation of

Section 2 of the Sherman Act, 15 U.S.C. § 2; and (3) concerted action in restraint of trade in

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15

U.S.C. § 14.

Plantronics denies the allegations.  Plantronics contends that it has not restrained trade or

unlawfully maintained a monopoly.  Further, Plantronics contends that its POD program did not

substantially foreclose competition or result in harm to competition, did not cause injury to GN

and did not cause any alleged damages.  Plantronics contends that its POD agreements promoted

competition and benefitted end user enterprise buyers.

18.    **The Purpose of the Antitrust Laws**

The primary purpose of the antitrust laws is to preserve and promote our system of free and open competition and to secure everyone an equal opportunity to engage in business, trade, and commerce, by preventing unreasonable restraint or monopolization of any business or industry so that the consuming public may receive better goods and services at lower cost. The Sherman Act, specifically, rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

A desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not unlawful.  The antitrust laws do not prohibit, without more, colorful, vigorous or aggressive language; the law does not require polite or "commercially correct" speech within corporate memoranda and business plans.

## 19.   Common Elements – Overview

I will now turn to the portion of my instructions that will guide you in assessing GN's claims and applying the law to the facts you find.  Because GN's claims have certain overlapping components, I am going to first instruct you on concepts that may appear as "common elements" so that you have the information you need in one place.

20.   **Common Element – Interstate or Foreign Commerce**

      Antitrust law applies only to conduct or restraints that affect interstate commerce.  In this case, GN contends that Plantronics' conduct affects interstate commerce.  Interstate commerce refers to transactions in goods or services between one or more persons in one state and one or more persons in another state.

      To affect interstate commerce, it is not necessary that Defendant's conduct itself occur in multiple states or directly affect transactions that span across multiple states.  It is enough if some activities of Plantronics that were affected by the conduct had some effect on interstate commerce.

21

## 21.   <u>Common Element – Relevant Market in General</u>

You will see that each of GN's claims requires you to analyze whether the accused conduct had anticompetitive effects.  These effects must occur with respect to a relevant market; GN must prove the relevant market(s) by a preponderance of the evidence

There are two aspects you must consider in determining whether GN has met its burden to prove the relevant market(s).  The first is the relevant *product* market.  The second is the relevant *geographic* market.

22

22.   **Common Element – Relevant Geographic Market**

The relevant geographic market is the area in which Plantronics and GN face competition from other firms that compete in the relevant product market, and where customers can reasonably turn for purchases.  When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market.  The geographic market may be as large as nationwide or as small as a single town or neighborhood.

GN has the burden of proving the relevant geographic market by a preponderance of the evidence.  In this case, GN claims that the relevant geographic market is the United States and Canada.  In determining whether GN has met is burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including, but not limited to:

- The geographic area in which Plantronics and GN sell and where Plantronics' and GN's customers are located;

- The geographic area to which customers have turned, or have seriously considered turning to, for supply;

- The transportation cost differences between the areas;

- The geographic areas that suppliers view as potential sources of competition; and

- whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

23.   **Common Element – Relevant Product Market**

GN must prove, by a preponderance of the evidence, the existence of a relevant product market.  The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.

In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable so long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material – such as aluminum foil, cellophane, or even plastic containers – to be reasonable alternatives, then all those products would be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn?  Generally speaking, a small but significant permanent increase in price is approximately a 5% increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may consider: (1) consumers' views on whether the products are

24

interchangeable; (2) the relationship between the price of one product and the sales of another; (3) the presence or absence of specialized vendors; (4) the perceptions of either the industry or the public as to whether the products are in separate markets; (5) the views of GN and Plantronics regarding which products compete against each other; (6) the existence or absence of different customer groups or distribution channels; (7) disadvantages to using other products that might deter customers from substituting to products outside of the market; and (8) differences in prices for particular products.

In this case, GN contends that the relevant product market is the market for traditional CC&O headsets.  GN contends that there is an alternative market that consists of Direct Value Added Resellers ("DVARs"); this "submarket" will be discussed in the next section.  Plantronics contends that GN did not correctly define the relevant market.  Plantronics contends that the relevant product market is all contact center and office headsets, including unified communications headsets.

24.   **Common Element – Relevant Product Market - DVARs**

In addition to the alleged product market of traditional CC&O headsets, GN alleges that there is a smaller price-discrimination market of direct value-added resellers, or DVARs, and that the accused anticompetitive conduct forecloses GN from that market.  Plantronics contends that GN has not proven by a preponderance of the evidence the existence of GN's alleged smaller relevant price-discrimination market of DVARs.  Plantronics contends that the distributors and resellers included in GN's alleged DVAR market compete with all distributors and resellers of contact center and office headsets.

The standards set out in the immediately preceding section on relevant product markets apply in determining whether GN's DVAR submarket is valid.

**25.**   **Common Concept -- Market Power**

In determining if Plantronics' alleged restraints substantially harmed competition, you should consider whether Plantronics had market power.

Market power is defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power.

In determining whether Plantronics has market power, you may consider Plantronics' share or portion of the relevant market; that is, its percentage of the products or services sold in the relevant market by all competitors. The mere possession of market power is not unreasonable or illegal. If you find that Plantronics possesses market power, you must still consider other elements of GN's claims that I will discuss further below.

Factors you may consider in determining whether defendant has market power include whether there are any durable barriers to entry by new firms in the market, and evidence concerning the intensity of competition within that market. In addition, if you decide that the buyers are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power defendant might otherwise have. If a plaintiff cannot show that a defendant had the power to force buyers to enter into exclusive contracts they did not want, this would be an indication that the defendant lacks market power. You should consider whether the process in which the defendant secured exclusive contracts itself involved competition. If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for

27

the exclusive contracts against defendant, this is also evidence that defendant does not have market power.

26.   **Common Concept -- Foreclosure**

Foreclosure means that rivals are prevented from competing for an account.  Total foreclosure is not required for the restraints at issue to be unlawful, nor is complete exclusivity required with each customer.  In determining whether the accused conduct foreclosed competition on the merits, it is also relevant to consider the percentage of the market foreclosed. Where the exclusive dealing arrangements foreclosed more than 50 percent of the market, this is an indicator that the harm from the foreclosure of competition could be substantial.  Where the exclusive dealing arrangements foreclose less than 20 percent of the market, this tends to indicate that the harm from the foreclosure of competition is not substantial because alternatives are available.

Foreclosure is considered substantial only when it weakens competitors to such an extent that the competitors cannot constrain the power of the defendant, here Plantronics, to raise prices, lessen buying options, restrict output, or lessen quality.  If there are sufficient alternative ways for competing suppliers to effectively reach end users with their products, then a restraint does not foreclose competitors' access to the market.

**27.**   <u>**Common Concept – Rule of Reason**</u>

In this case, GN claims that two terms in Plantronics' POD agreements are *de facto* exclusive dealing agreements that are an unreasonable restraint trade that resulted in an adverse effect on competition under Section 1 of the Sherman Act and Section 3 of the Clayton Act.  It is your job to determine whether the alleged restraints challenged here are unreasonable under what is known as the "rule of reason."

A restraint of trade is illegal only if it is found to be unreasonable.  You must determine, therefore, whether the alleged restraints challenged here – the two terms in Plantronics' Plantronics Only Distributor agreements with distributors and resellers – were unreasonable restraints of trade.  In making this determination, you must first determine whether GN has proven that the challenged restraints resulted in a substantial harm to competition in the relevant markets.  If you find that GN has proven that the challenged restraints resulted in a substantial harm to competition in the relevant market, then you must consider whether the restraint produced countervailing competitive benefits.  If you find that it did, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal only if you find that the competitive harm substantially outweighs the competitive benefit.

**28.**    **Common Concept – Rule of Reason – Proof of Competitive Harm**

As I mentioned, in order to prove that a challenged restraint is unreasonable, GN first must demonstrate that the restraint has resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of GN is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor does not necessarily mean that there has been harm to competition.

A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, more product options, increased output, and higher product quality. If the challenged conduct did not or has not resulted in higher prices, less product choices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality and service;
- the purpose and nature of the restraint;
- the nature and structure of the relevant market, both before and after the restraint was imposed;
- the number of competitors in the relevant market and the level of competition among them,
- whether new competitors entered the market, both before and after the restraint was imposed; and
- whether Plantronics possesses market power.

To determine whether the accused conduct had a substantial harmful effect on competition, you should consider, with respect to the relevant markets: the nature and history of the use of exclusive dealing contracts in the relevant market; whether distributors and resellers had independent reasons for entering into exclusive dealing contracts or were coerced into entering into them; whether other competing suppliers also offered exclusive contracts; the extent of competition among competing suppliers for exclusive contracts with buyers; Plantronics' position in the relevant market; the competitive alternatives to Plantronics' products or services; the reasons Plantronics and the distributors and resellers entered into the Plantronics Only Distributor agreements at issue; the effect of the use of exclusive dealing contracts on the ability of new firms to enter the relevant market and on price and other competition in the relevant market; as well as the Plantronics' market power.

In determining the extent to which the challenged restraint(s) foreclosed competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing arrangements foreclose more than 50% of the market, this is an indicator that the harm from the foreclosure of competition is substantial. Where the exclusive dealing arrangements foreclose less than 20% of the market, this is an indicator that the harm from the foreclosure of competition is not substantial because there are alternatives available.

However, these are simply factors for you to consider, they are not dispositive. In the end, the key question is whether it was practical for the distributors and resellers to terminate the exclusive dealing arrangement with Plantronics, and if it was not, whether the coercion to exclusively deal with Plantronics foreclosed a substantial share of the relevant market such that competition was harmed. In considering all of these facts, you should determine whether the exclusive dealing contract adversely affected the price paid by distributor or reseller or end-user,

the quality of the product offered in the relevant market, or output.  Where the restrain adversely affects price, quality, and output, it is likely a substantial harm to competition.

29.   **Common Concept – Rule of Reason – Evidence of Competitive Benefits**

If you find that GN has proved that any of the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways.  If you find that Plantronics has proved that the challenged restraint does result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits.  If GN proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

**30.**   **Common Concept – Rule of Reason – Balancing the Competitive Effects**

If you find that the challenged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors.  GN bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

31.   <u>**Claims – Overview**</u>

Now that we have covered some of the common concepts that apply to GN's claims, I am going to turn to instructing you on the specific elements of each of GN's claims.  For elements that are not covered by the common elements instructions above, I will provide you with the information you need in the following instructions.

**32.**   **Sherman Act Section 1 - Unreasonable Restraint of Trade - Elements**

   GN's first claim is that Plantronics' conduct unreasonably restrained trade in violation of Section 1 of the Sherman Act.

   Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, GN must prove the following, by a preponderance of the evidence:

    **First**, the existence of a contract or combination between or among at least two separate entities;

    **Second**, that the contract or combination unreasonably restrained trade;

    **Third**, that the restraint affected interstate or foreign commerce; and,

    **Fourth**, that the restraint caused GN to suffer an injury to its business and property.

   If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Plantronics and against GN on this claim.  If you find that GN has proven each of these elements by a preponderance of the evidence, then you must find for GN and against Plantronics on this claim.

### 33. **Sherman Act Section 2 -- Monopolization – Elements**

GN's second claim is that Plantronics unlawfully monopolized the North American market for traditional CC&O headsets in violation of Section 2 of the Sherman Act. Plantronics denies these allegations.

To prevail on its monopolization claims, GN has the burden of proving each of the following elements by a preponderance of the evidence:

**First**, that the alleged market is a valid antitrust market;

**Second**, that Plantronics possessed monopoly power in that market;

**Third**, that Plantronics willfully maintained monopoly power in that market by engaging in anticompetitive conduct;

**Fourth**, that Plantronics' conduct occurred in or affected interstate and foreign commerce; and

**Fifth**, that GN was injured in its business or property because of the Plantronics' anticompetitive conduct.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Plantronics and against GN on this claim. If you find that GN has proven each of these elements by a preponderance of the evidence, then you must find for GN and against Plantronics on this claim.

**34.**   **Sherman Act Section 2 -- Monopolization – Existence of Monopoly Power**

To prevail on its monopolization claims, GN must prove by a preponderance of the evidence that Plantronics had monopoly power in the relevant market.  Monopoly power is the power to control prices or exclude competition in a relevant antitrust market.  More precisely, Plantronics is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  However, possession of monopoly power, in and of itself, is not unlawful.

The evidence presented by the parties includes evidence of Plantronics' market share, market share trends, entry and exit by other companies, the number and size of other alleged competitors.

**Market Share**.  The first factor you should consider is Plantronics' share of the relevant market(s).  Based on the evidence you have heard about Plantronics' market share, you should determine its market share as a percentage of total sales in the relevant market(s).  Plantronics must have a significant share of the market in order to possess monopoly power.  Market share alone is not sufficient to establish monopoly power.

**Market Share Trends**.  The trend in Plantronics' market share in the valid relevant market also is something you may consider.  A market share that increases over time may strengthen an inference that a company has monopoly power, particularly where that company has a high market share. A decreasing market share may indicate the absence of monopoly power.

**Barriers to Entry**.  You may also consider whether there are durable barriers to entry into the relevant market.  Durable barriers to entry make it difficult for new competitors to enter the valid relevant market in a meaningful and timely way. Barriers to entry might include

intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of high barriers to entry along with high market share may support an inference that Plantronics had monopoly power. By contrast, evidence of low or no entry barriers may be evidence that Plantronics did not have monopoly power, regardless of its market share, because new competitors could enter easily if Plantronics attempted to raise prices for a substantial period of time.

**Entry and Exit by Other Companies**. The history of entry and exit in the valid relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Plantronics lacked monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, may support an inference that Plantronics has monopoly power.

**Number and Size of Competitors.** You may consider whether Plantronics' competitors were capable of effectively competing. In other words, you should evaluate whether the financial strength, market shares, and number of competitors in the valid relevant market acted as a check on Plantronics' ability to price its products. If Plantronics' competitors were vigorous or had large or increasing market shares, this may be evidence that Plantronics lacked monopoly power. On the other hand, if you determine that Plantronics' competitors were weak or had small or declining market shares, this may support an inference that Plantronics had monopoly power.

**35.**   **Sherman Act Section 2 – Monopolization – Willful Maintenance of Monopoly Power**

The next element GN must prove is that Plantronics willfully maintained monopoly power through anticompetitive acts or practices.  Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws.  A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals--or the achievement of these goals--unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Plantronics' conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the

conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

36.   **Sherman Act Section 2 – Attempted Monopolization Claim – Elements**

GN's third claim is that it was injured by Plantronics' alleged unlawful attempt to monopolize the market for traditional CC&O headsets. Plantronics denies these allegations. To prevail on its claim of attempted monopolization, GN has the burden of proving each of the following elements by a preponderance of the evidence:

**First**, that Plantronics engaged in anticompetitive conduct;

**Second**, that Plantronics had a specific intent to achieve monopoly power in a relevant market;

**Third**, that there was a dangerous probability that Plantronics would achieve its goal of monopoly power in the relevant market; and

**Fourth**, that Plantronics' conduct occurred in or affected interstate and foreign commerce; and

**Fifth,** that GN was injured in its business or property by Plantronics' anticompetitive conduct.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Plantronics and against GN on this claim. If you find that GN has proven each of these elements by a preponderance of the evidence, then you must find for GN and against Plantronics on this claim.

**37.**   **Sherman Act Section 2 -- Attempted Monopolization -- Anticompetitive Conduct**

It is not sufficient for GN to prove that Plantronics intended to monopolize the relevant market.  GN must also show that Plantronics engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that defendant would succeed.  Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct.

As noted above, Plantronics contends that its challenged-agreements with distributors and resellers have benefits for the market that serve as procompetitive justifications for the agreements.

**38.**   <u>**Sherman Act Section 2 -- Attempted Monopolization -- Specific Intent**</u>

   I have already instructed you as to the relevant market and anticompetitive conduct, and you should follow those instructions in analyzing GN's attempted monopolization claim. I will now discuss specific intent. In order to prevail on its claim for attempted monopolization, GN must prove that Plantronics had a specific intent to monopolize a relevant market.

   There are several ways in which GN may prove that Plantronics had the specific intent to monopolize. There may be evidence of direct statements of Plantronics' intent to obtain a monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Plantronics at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Plantronics. You must be careful, however, to distinguish between Plantronics' intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

   Even if you decided that the evidence does not prove directly that Plantronics actually intended to obtain a monopoly, specific intent may be inferred from what Plantronics did. For example, if the evidence shows that Plantronics lacked a legitimate business justification and the natural and probable consequence of Plantronics' conduct in the relevant market was to give Plantronics control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Plantronics, then you may (but are not required to) infer that Plantronics specifically intended to acquire monopoly power.

### 39.   Sherman Act Section 2 -- Attempted Monopolization – Dangerous Probability of Success

If you find that Plantronics had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Plantronics would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

In determining whether there was a dangerous probability that Plantronics would acquire the ability to control price in the markets, you should consider such factors as:

1.   Plantronics' market share;

2.   The trend in Plantronics' market share;

3.   Whether the barriers to entry into the market made it difficult for competitors to enter the market;

4.   The strength of the competition;

5.   The probable development of the industry;

6.   The nature and likely effect of any anticompetitive conduct on Plantronics' share of the market;

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Plantronics would ultimately acquire monopoly power.

40. **Clayton Act Section 3 Claim - Elements**

GN's fourth claim is under Section 3 of the Clayton Act.  GN alleges that Plantronics used exclusive dealing arrangements with distributors and resellers to foreclose competition in a substantial portion of the relevant markets, and that GN was injured as a result of these exclusive dealing arrangements.  To succeed on this claim, GN must prove the following four elements by a preponderance of the evidence:

**First**, that Plantronics sold traditional CC&O headsets, or entered into contracts for the sale of traditional CC&O headsets, for use, consumption, or resale in the United States;

**Second**, that in its sales or contracts for such headsets, Plantronics established an agreement or understanding that the purchaser would not directly purchase, advertise, or promote the goods of a competitor or competitors of Plantronics;

**Third**, the effect of such sales, or contracts for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in a relevant market;

**Fourth**, GN was injured in its business or property as a proximate result of Plantronics' conduct.

GN claims that, among other things, Plantronics offered benefits to the distributors and resellers in return for agreements not to deal with GN and to block GN's access to headset end-users.

You need not find that the agreement contained a specific, express agreement to use or purchase only Plantronics' products to conclude that it was an exclusive dealing arrangement because a condition, agreement or understanding may be either expressly stated or inferred from the circumstances.

Plantronics' agreements may be found to be exclusive dealing arrangements if they had the practical effect of substantially preventing the purchase of GN's goods. An agreement may be an exclusive dealing arrangement even if it does not require a 100% commitment to deal only in the seller's products. You also may find that the dealing arrangement substantially lessened competition if you find that competition has been foreclosed in a substantial share of the line of commerce affected.

If you find that the evidence is not sufficient to prove any one or more of these elements, then you must find for Plantronics and against GN on this claim. If you find that GN has proven each of these elements by a preponderance of the evidence, then you must find for GN and against Plantronics on this claim.

**41.**   **Clayton Act Section 3 Claim - Use, Consumption or Resale in the United States**

As to the first element of GN's Clayton Act Section 3 claim, you must determine whether

Plantronics sold traditional CC&O headsets, and entered into contracts for the sale of traditional

CC&O headsets, for use, consumption or resale in the United States.

42.   **Injury and Causation**

If you find that the accused conduct violated either the Sherman Act or the Clayton Act, then you must decide if GN has been injured by Plantronics's conduct and, if so, if it is entitled to recover damages from Plantronics for that injury.

GN is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

**First**, that GN was in fact injured as a result of the accused violation of the antitrust laws;

**Second**, that the alleged illegal conduct was a material cause of GN's injury; and

**Third**, that GN's injuries are injuries of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For GN to establish that it is entitled to recover damages, it must prove that it was injured as a result of the alleged violation of the antitrust laws. Proving causation does not require GN to prove the precise dollar value of its injury. It requires only that GN prove that it was in fact injured by the alleged antitrust violation.

If you find that GN has established that it was in fact injured, you may then consider the amount of GN's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that GN has established that it was in fact injured.

GN must also offer evidence that establishes as a matter of fact and with a fair degree of certainty the alleged illegal conduct was a material cause of GN's injury. This means that GN must prove that some damage occurred to it as a result of the alleged antitrust violation and not some

50

other cause. GN is not required to prove that the accused conduct was the sole cause of its injury; nor need GN eliminate all other possible causes of injury. It is enough if GN has proven that the alleged antitrust violation materially contributed, or substantially contributed, to GN's injury, even if other factors also contributed.

Finally, GN must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If GN's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then GN's injuries are antitrust injuries. On the other hand, if GN's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then GN's injuries are not antitrust injuries and GN may not recover damages for those injuries under the antitrust laws.

43.   **Definition of Business or Property**

GN must establish that the injury it claims to have suffered was an injury to its "business or property." The term "business" includes any commercial interest or venture, and you are instructed that GN has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of Plantronics' alleged antitrust violation. The term "property" includes anything of value GN owns, possesses, or in which GN has a protectable legal interest. You are instructed to that GN has been injured in its property if you find that anything of value that it owns, possesses, or has a legal interest in has been damaged as a result of Plantronics' alleged antitrust violation. You are further instructed to find that GN has been injured in its "business or property" if you find it has lost money as a result of Plantronics' alleged antitrust violation.

**44.    Antitrust Damages - Purpose**

If you find that Plantronics violated the antitrust laws and that this violation caused injury to GN, then you must determine the amount of damages, if any, that GN is entitled to recover.

The fact that I am giving you instructions concerning the issue of GN's damages does not mean that I believe GN should, or should not, prevail in this case.  If you reach a verdict for Plantronics on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that GN should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible to the position in which it would have been if the alleged antitrust violation had not occurred. The law does not permit you to award damages to punish a wrongdoer – what we sometimes refer to as punitive damages – or to deter a defendant from particular conduct in the future, or to provide a windfall to someone who has been the victim of an antitrust violation. You are also not permitted to award GN an amount for attorneys' fees or the cost of maintaining this lawsuit. Antitrust damages are compensatory only. In other words, they are designed to compensate GN for the particular injuries it suffered as a result of the alleged violation of the law.

**45.**   **Antitrust Damages - Calculation**

You are permitted to make just and reasonable estimates in calculating damages.  You are not required to calculate damages with mathematical certainty or precision.  However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates.  Damages may not be based on guesswork or speculation. GN must prove the reasonableness of each of the assumptions upon which the damages calculation is based.  If you find that a damages calculation cannot be based on evidence and reasonable inference, and instead can only be reached through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages.  So long as there is a reasonable basis in the evidence for a damages award, GN should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.

If you find that GN has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.  If you find that GN has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

**46.**   **Lost Profits**

GN claims that it was harmed because it lost profits as a result of Plantronics' alleged antitrust violation.  If you find that Plantronics committed an antitrust violation and that this violation caused injury to GN, you now must calculate the profits, if any, that GN lost as a result of Plantronics' antitrust violation.  To calculate lost profits, you must calculate net profit: the amount by which GN's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.

**47.**   <u>**Causation and Disaggregation**</u>

If you find that Plantronics violated the antitrust laws and that GN was injured by that violation, GN is entitled to recover for such injury that was the direct result or likely consequence of the illegal acts of Plantronics.  GN bears the burden of showing that its injuries were caused by Plantronics' antitrust violation, as opposed to any other factors.  If you find that GN's alleged injuries were caused in part by Plantronics' alleged antitrust violation and in part by other factors, then you may award damages only for that portion of GN's alleged injuries that was caused by Plantronics' alleged antitrust violation.

GN claims that it suffered injury because it lost sales and profits as a result of Plantronics' POD agreements with distributors and resellers.  Plantronics contends that any profits or sales lost by GN occurred as a result of other factors that have nothing to do with the two POD terms.  GN only may recover for damages caused by the alleged antitrust violation.

**48.** __Damages Period__

      In this case, the antitrust laws do not allow for recovery of damages for any injuries sustained by GN prior to October 12, 2008.  If you find that GN suffered injuries spanning both before and after October 12, 2008, then you must apportion the damages between the two periods and you may award damages only for the portion of the injuries suffered after October 12, 2008.

      When apportioning the damages between the two periods, you should be guided by the same principles I explained to you earlier.  That is, you are permitted to make just and reasonable estimates in apportioning GN's alleged damages.  You are not required to apportion damages with absolute mathematical certainty or precision.  However, the apportionment of damages must have a reasonable basis in the evidence.

49.   **Mitigation of Damages**

GN may not recover damages for any portion of its injuries that it could have avoided through the exercise of reasonable care and prudence.  GN is not entitled to increase any damages through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If GN failed to take reasonable steps available to it, and the failure to take those steps resulted in greater harm to GN than it would have suffered had it taken those steps, then GN may not recover any damages for that part of the injury it could have avoided.

Plantronics has the burden of proof on this issue. Plantronics must prove by a preponderance of the evidence that:

**First,** GN acted unreasonably in failing to take specific steps to minimize or limit its losses;

**Second**, that GN's failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps; and

**Third**, the amount by which GN's loss, if any, would have been reduced had GN taken those steps.

In determining whether GN failed to take reasonable measures to limit its damages, the evidence must show that GN failed to take commercially reasonable measures that were open to it.  Commercially reasonable measures mean those measures that a prudent businessperson in GN's position would likely have adopted, given the circumstances as they appeared at that time. GN should be given wide latitude in deciding how to handle the situation, so long as what GN did was not unreasonable in light of the existing circumstances.

**50.**    **Deliberation and Verdict**

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you. Any questions or messages normally should be sent through your foreperson, who by custom of this Court is Juror No. 1.

One more thing about messages. Do not ever write down or tell anyone else how you stand on your votes. For example, do not write down or tell anyone else that you are split 5-2, or 3-4, or whatever your vote happens to be. That should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if you become convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.

Remember at all times that you are not partisans. You are the judges - judges of the facts. Your sole interest is to seek the truth from the evidence in this case.

A form of verdict has been prepared for you, and you have been provided a copy. I will read it to you shortly. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form. You will then return to the courtroom and your foreperson will give your verdict to my deputy.

It is proper to add the caution that nothing said in these instructions and nothing in the form of verdict is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that - your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smartphone, tablet, or computer, the Internet, any Internet service or tool, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, LinkedIn, YouTube, Instagram, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way.